## Wilhelm's Appeal.    Grubb's Appeal.[1]

1. A bill was filed in 1865, praying an account of ores taken from a tenancy in common, setting forth the title, and describing the premises held in common by courses and distances. Seven years afterwards the bill was amended by charging that ores had been taken outside the limits of what had been described as the common property in the original bill, and, by putting the prayer in the alternative, asking an account co-extensive with what the court should decide from the title set forth to be the tenancy in common. *Held*, that the Statute of Limitations was not a defence to the bill as amended, because the cause of action set forth therein was the same as that set forth in the original bill. *Held*, further, that where a question of title is necessarily involved, it is within the jurisdiction of a court of equity to decide it.

[1] I am indebted for this excellent report to S. S. Hollingsworth, Esq.

P. F. S.

[Wilhelm's Appeal.]

2. The rules as to amendment at law and in equity are the same.

3. The limit of the power of amendment is, that no new cause of action can be engrafted on the original declaration.

4. A party may at law or in equity shift his ground, if his title and the facts charged will sustain his new ground, and the decree prayed for or any other consistent decree within his prayer for general relief. The true criterion as to amendment is, did the plaintiff so state his cause of action originally as to show that he had a legal right to recover what he subsequently claims?

5. A prayer with a double aspect is not an objection to the bill.

6. Although a question of title may be involved, it is within the jurisdiction of an equity court.

7. Where there is jurisdiction of the subject-matter, equity may determine every incidental question necessarily involved.

8. Danzeisen's Appeal, 23 P. F. Smith 65, approved.

May 26th, 27th and 28th 1875. Before AGNEW, C. J., SHARS-WOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeals from the Common Pleas of *Lebanon county:* No. 85 and 130, to May Term 1875.

These were appeals from a decree dismissing a bill in equity, filed originally by William G. Freeman, administrator of Robert W. Coleman, against some of the decedent's co-tenants in certain ore-banks and mine-hills, praying an account for the ore taken by them. The material facts, appearing by the pleadings in the case, were as follows:—

In 1785 Curtis Grubb, Robert Coleman and Peter Grubb owned Cornwall Furnace Estate, including the Cornwall " Ore-Banks and Mine-Hills."

Peter Grubb died, leaving a will by which he devised all his real and personal estate to his two sons, then minors, Burd Grubb and Henry Bates Grubb.

On May 6th 1786, an agreement was executed between Curtis Grubb, Robert Coleman and the executors of the will of Peter Grubb and guardians of said minor sons of Peter Grubb, Burd and Henry Bates Grubb, by which it was covenanted, *inter alia,* that the " ore-banks belonging to Cornwall Furnace" should be divided into three equal parts, and two equal third parts should be assigned to Curtis Grubb and Robert Coleman, *according to their several* shares therein, and the other equal third part thereof should be assigned and allotted to Burd Grubb and Henry Bates Grubb, to be by them respectively held in common. It was further agreed that amicable actions should be instituted in the Court of Common Pleas of Lancaster county for the purpose of fully effecting the said agreement.

On the 30th of August 1787, a further agreement was executed between the same parties, by which the agreement of May 6th 1786 was modified so that the " ore-banks belonging to Cornwall Furnace" should thereafter remain together and undivided as a tenancy in common. It was provided in said agreement " that for

this purpose an accurate survey shall be made of said ore-banks and mine-hills, if not already done." This agreement was still further modified by a supplemental agreement bearing the same date, August 30th 1787, whereby, after reciting "that it may so happen that veins of ore may extend beyond the limits of the survey lately made by Thomas Clark," it was agreed that the said Burd Grubb, Henry Bates Grubb, and Robert Coleman, their heirs and assigns, should also have liberty and power to raise and carry away "any ore that may be found to extend beyond the limits of said survey."

Under these agreements for partition, amicable actions were begun and the land divided, and tracts numbered one and two on a plot then lately made by Thomas Clark, excepting thereout the draft of the ore-banks and mine-hills lately surveyed by Thomas Clark, and twelve other tracts, were awarded to Curtis Grubb and Robert Coleman.

Robert Coleman purchased part of the shares of his co-tenants, so that in 1825, when he died, he was seised of five undivided sixths of these ore-banks and mine-hills, and in severalty of the land surrounding them, out of which, in the prior partition, they had been excepted to be kept always as a tenancy in common. By his will he devised to his sons, William, James and Edward Coleman, the several furnaces and iron-works called Cornwall Furnace, of which tracts one and two, referred to in the partition of 1787, were a part, and out of which the ore-banks and mine-hills had been excepted from said partition. To his son Thomas Bird Coleman he devised Colebrook Furnace. He then devised as follows:—

"Item. I give, devise and bequeath to my dear sons, William Coleman, James Coleman, Edward Coleman, and Thomas Bird Coleman, and to their heirs and assigns for ever, as tenants in common, all the mines, ores, banks, and hills of mine or ore, of iron or other metals, base or precious, of every kind or sort whatsoever, that is to say, all my right, title, and interest of, in and to the same, although the same may be included within the bounds and limits of any of my lands hereinbefore devised to my said sons, or belonging to any of the iron-works, to them or any of them respectively devised, hereby meaning and expressly excepting the same out of any such previous devise, and intending to pass and expressly passing the same under this clause of my will, and no other."

In 1828, by purchase from their brothers, James Coleman and Thomas Bird Coleman became seised equally as tenants in common, in fee, of Cornwall Furnace and Elizabeth Furnace estates; and James Coleman became the owner of the undivided thirty ninety-sixth parts, and Thomas Bird Coleman of the undivided fifty ninety-sixth parts of all "the mines, ores, banks, or hills of mine,

or ore," of iron or other metals, base or precious, of any kind whatsoever," devised by the last recited clause of their father's will.

In 1831 James Coleman died intestate, leaving five children, in whom his undivided interest in the said Cornwall ore-banks and mine-hills vested, subject to his widow's right of dower. In the same year an action of partition was brought by Thomas Bird Coleman against the said children of his brother James, which resulted in the division of the estate they held in common, except the " ore-banks and the mine-hills of the Cornwall estate, the same having been excepted and reserved out of the partition demanded, and still remaining a tenancy in common according to the respective rights of the parties in interest." Under these proceedings in partition, Cornwall Furnace estate, which included tracts Nos. 1 and 2, before referred to, in which said ore-banks and mine-hills were situated, was allotted and assigned to Thomas Bird Coleman. Thomas Bird Coleman died intestate in 1836, leaving six children, between whom partition was had in 1848, whereby all his interest in said Cornwall ore-banks and mine-hills became vested equally in his two sons, Robert W. and William Coleman. By partition between the heirs of James Coleman in 1849, his undivided thirty ninety-sixth parts of said Cornwall ore-banks and mine-hills became vested equally in his two sons, Robert and G. Dawson Coleman.

In 1823 Henry Bates Grubb died intestate, and, by partition between his children in 1836, his share, sixteen undivided ninety-sixth parts of said Cornwall ore-banks and mine-hills became vested in his two sons, Edward B. and Clement B. Grubb.

In June 1851, Robert W. Coleman filed a bill in equity in the Court of Common Pleas of Lebanon county against his co-tenants, praying an account of ores taken by them from the common property. Under this bill an account was had of the ore taken within the lines of the Clark survey: see Coleman's Appeal, 12 P. F. Smith 252.

On June 5th 1865, William G. Freeman, the administrator of Robert W. Coleman, deceased, filed a bill in equity, the *original* bill in the present suit, against the co-tenants of his decedent, alleging that said co-tenants held, together and undivided, as tenants in common, three ore-banks and iron ore-hills, known as the " Cornwall Ore-Banks and Mine-Hills," in the county of Lebanon, and describing the same by the courses and distances laid down in the draft to the survey of the Cornwall ore-banks and mine-hills, alleging that each of the said parties had mined and carried away ore from said tracts, and praying for an account.

On the first day of December 1865, the plea and answer of G. Dawson Coleman, and also of Robert Coleman, were filed. Each in his plea pleaded that the premises particularly described in the bill did not constitute or compose the property known as and called

the Cornwall Ore-Banks and Mine-Hills, but said Cornwall Ore-Banks and Mine-Hills included not only the tracts described in said bill, but also other deposits of ore both upon and under the surface of the earth extending beyond the limits of said tracts.

In August 1867, replications were filed, the plaintiff Wm. G. Freeman having died in the meantime, and substitution of administrators *de bonis non* having been made.

On June 3d 1872, application was made to file an amended bill, which was allowed on proof of notice. On November 25th 1872, an amendment to the amended bill was filed by *consent.*

The amended bill differed from the original bill in setting forth with greater particularity the same deeds, partitions and records pleaded in the original bill, but therein pleaded by reference to the same, instead of being set forth as they were in the amended bill in many cases *totidem verbis.* It also contained two additional averments:—

1. An averment setting forth the proceedings in a partition suit commenced in 1851, by G. Dawson Coleman; and,

2. An averment setting forth the proceedings in equity commenced in the same year by Robert W. Coleman, for an account.

In each of these suits the defendants Coleman, in their pleadings, therein described the common property in the same way that it was described in the original bill in the present suit. The prayer of the amended bill differed from the prayer of the original bill in being in the alternative, praying if the court should be of opinion that under the title set forth the tenancy in common was confined to the tracts particularly described in the bill, for an account of ore taken from said tracts; but if, on the other hand, the court should be of opinion that the tenancy in common was not confined to said tracts, praying for an account of the ores taken from without as well as from within said tracts.

The amendment of November 25th 1872 to the amended bill consisted of a prayer that the same might be considered, if the court thought best, as a petition for a further account under the bill of 1851. On the 7th of February 1873, the demurrer, plea and answer of Robert Coleman were filed, and on March 26th 1873, the demurrer and answer of G. Dawson Coleman were filed. The chief grounds of demurrer were that the amended bill set forth a different cause of action from that set forth in the original bill, and did not aver that said cause of action accrued within six years before the filing of said bill; that the complainants had split their cause of action; that they denied a common title co-extensive with their claim for an account; that a court of equity could not decide the question of title upon which the extent of the claim for an account depended; and that the complainants could not make their claim in the alternative.

[Wilhelm's Appeal.]

The cause was argued on bill and demurrer on April 9th and May 6th 1874, before Pearson, P. J., and Henderson, J.

The demurrer was sustained by the court, Pearson, P. J., delivering the following opinion as to the Statute of Limitations:—

\* \* \* " We consider it now to be the well-settled principle and practice of courts of equity that advantage may be taken of the Statute of Limitations by demurrer, provided the lapse of time appears on the plaintiffs' bill without any reason being set forth to show that it should not apply : Smith v. Fox, 6 Hare 386 ; Hoare v. Peck, 6 Simons 51 ; 7 Paige's Ch. R. 195 ; Id. 373 ; 4 Wash. C. C. R. 631 ; Story's Eq. Pl., sects. 484, 503 ; Cooper's Eq. Pl. 254, 255 ; Milford Eq. Pl. 272, 273 ; Fyson v. Pole, 3 You. & Col. 266.

" Does it appear on the face of the bill, as amended, that more than six years have elapsed since the cause of action accrued, and the right to demand an account arose? It is set forth in the bill that Robert W. Coleman, the plaintiff, died on the 20th of December 1864, and letters of administration on his estate were issued to Col. Freeman on the 29th of the same month. The whole claim was for ore taken in the lifetime of Mr. Coleman, none could be made by his administrator for that taken after his death, as it is demanded by reason of their being tenants in common of the ore-banks and mine-hills, which are real estate, and would vest in his heirs-at-law on his death. The administrator offers to account for the ore taken by his intestate from the premises, which must have been in the lifetime of the latter. So that it sufficiently appears that it all occurred more than six years before the 3d of June 1872, when the amended bill was filed. Besides, that was more than six years after the filing of the original bill, and the answer thereto by Robert and George Dawson Coleman. It was well known and stated on the argument that after the 14th day of January 1864, the ore was dug and sold for the benefit of all, by an agent mutually appointed. It is said, however, that by the amendment the claim comes in as of the time of filing the original bill—that it is tacked to it. The matter introduced into the amendment is new, not contained in the original bill, but much changed and enlarged. In such cases the matter brought into the hill by amendment will not have relation to the time of filing the original, but the suit will be considered as pending so far only from the time of the amendment: Story's Eq. Pl., sect. 904; 2 Atkyns 218. New matter or new parties cannot be brought in by way of amendment, and thus avoid the effect of the statute as to either : 6 Peters 61–64 ; 11 Cl. & Fin. 556, in House of Lords.

" An amendment cannot be allowed where it brings in a new cause of action, otherwise barred. This was decided at law, in Shock v. M'Chesney, 4 Yeates 510–11. See to the same effect Farm. & Mech. Bank v. Israel, 6 S. & R. 293 ; though if it merely

[Wilhelm's Appeal.]

lays the same claim in a different form, it is admissible. 2d. As to amendment of parties, the claim is barred as to those afterwards brought in : Magaw *v.* Clark, 6 Watts 528. It was held in Wood *v.* Anderson, 1 Casey 407, improper to allow an amendment by which a claim would be brought in, which would otherwise be barred. It would scarcely be pretended that after an action of slander had been pending several years, new words could be laid by way of amendment, which would otherwise be barred, or a new note added to the *narr.* in assumpsit, against which the statute had run.

" In the present case the original bill most carefully claimed that the defendants should be held to account for all the ore taken out of the three hills, as set forth and specifically described by the lines, courses and distances in what is called ' Clark's survey.' In the amended bill an account is demanded of all of the ore taken and appropriated from either of the ore-banks or mine-hills, however extended ; and it is well known that those hills extended greatly beyond the ' Clark survey,' as in said lines set forth, and thereby introduced a new claim.

" The plaintiff asserts that he can lay his demand with a double aspect, asking for an account of all the ore taken from the land which he admits that they hold as a tenancy in common, and also from certain other lands, which he describes, and asks the court to decide whether that is or is not held in common also.

" There is no doubt of the power of a party by his bill to claim under a double aspect, and recover according to the right made out. Such is the case in 11 Verm. 290, where a portion of an estate was demanded on account of a will having been obtained by undue means, and that failing, that a note bequeathed by the same will to the plaintiff should be given up for cancellation. Or in 30 Ala. 286, where an account was demanded as a partner, and if that was not established, that certain money advanced to carry on the business should be repaid.

" But he cannot set forth an entirely inconsistent state of facts, and ask for relief in the alternative. It must be consistent with the bill : Colton *v.* Ross, 2 Paige's C. 397. Also 1 Johnson & Murray 458 ; 2 Schoales & Lef. 9 ; 7 Vesey 211. But he may state the facts, and ask 'for relief as they may be found by the court : 4 C. E. Green (N. J.) 29.

" In this case, after stating the tenancy in common of the land within the survey, the bill goes on to describe that without its bounds, on lots numbers one and two of the subdivisions of the property partitioned, as part of the Cornwall estate, and then expressly denies that there is any common property in the ores on the subdivisions, and the whole statement of facts and course of reasoning is introduced to show that none of the defendants have any interest in or claim to the ores, or any parts thereof, on lots

[Wilhelm's Appeal.]

numbers one and two, and yet asks that they shall account therefor as tenants in common. Thus not only is the right of defendants to take ore outside of the survey denied, but the whole history of the various partitions is introduced at length in the bill as amended, to prove that there is no such right. To us it has always been very clear that the 'Clark survey' was intended merely to set apart the surface land, which was to remain in common, and not taken into any of the purparts, whilst either of the tenants in common should have full liberty to enter upon any of the ore on Cornwall hills, outside of the survey, and extending beyond it, and sink shafts, drive drifts, dig, take and carry away ore, the same as within the survey. This left them tenants in common of that ore the same as before partition, whilst the land itself was parted and divided to the lines of the survey. Such was the agreement of August 1787, between the former owners. It was almost inexcusable in the bill of June 5th 1865, to question the right to the ore outside of the 'Clark survey,' or that the same was held as common property. This court ruled in Coleman v. Grubb as early as 1853, that the ore outside as well as inside of the survey was common property, and that decision was affirmed in the Supreme Court in 11 Harris 393. It was again decided in the same way by the Supreme Court in Blewett v. Coleman, 4 Wright 46, in the year 1861, and it has been so held at every time the case came up; so that point should have been considered as settled, if any question can be settled in Pennsylvania. To claim, therefore, as is done in the original bill in the present case, filed in June 1865, was sinning against light and knowledge. Had the amendment been resisted in 1872, and the character thereof brought to the attention of the court, it probably would not have been received, as a party cannot, under the privilege of amendment, introduce matter which would constitute a new bill: 1 Ed. Ch., p. 46. It should appear that the matter had come to his knowledge since filing the original bill: Id. 46-7. And where new matter is introduced by way of amendment the same defence can be made against it as to a new bill then filed: 3 Iredell's Ch. 535. So as to new parties: 11 Clark & Finnelly, already cited. An amendment of an original bill, so far as it asserts a new title or claim, is considered an original so far as regards the Statute of Limitations: Holmes v. Moreland, 1 M'Lean C. C. 1. This affirmed in S. C. U. S. It is otherwise where the same title is asserted in a different way: Id. We consider this a new claim, and the assertion of a different title, so far as regards the ore outside of the survey, by which the three hills are described in the original bill. Where a bill is asked to be amended, both as to discovery and relief, the suit as to such matter is only considered as pending from the time of the amendment allowed: 2 Atk. 218.

"Substantially a new bill cannot be introduced by way of amend-

ment: 17 How. 144. As to the new matter, the bill is considered as pending from the time of the amendment:- 1 Dan. Ch. Prac. 402–3. A plaintiff must by his bill show a clear right to recover on the facts stated, and cannot resort to defendant's answer to make out his case: 1 Bland Ch. 250. He must state a distinct title to recover in equity: Id. 252. In the present case relief is asked in the alternative, which is often proper, but that can scarcely be allowed where it is denied that the property was held in common. It is like the case in 2 Sch. & L., p. 9, where a contract is asked to be enforced which the party, by his bill, avers never was made. See also 7 Ves. 211. Many of the principles referred to and cases cited are reiterated and relied on by Mr. Justice Sharswood in a very able opinion reported in the Legal Gazette of April 29th 1870—Chambers *v.* Waterman—where it is held that an amendment, which in effect amounts to a new bill, is inadmissible, and the parties can only be affected from the time of the change. If their rights would be injured the amendment cannot be allowed. In the present case no application has been made to strike off the amendment, but the party has met it by a demurrer." * * *

On January 5th 1875, a decree was entered dismissing the bill because the relief was barred by the Statute of Limitations, and because the demand for an account was for ore taken from property of which the tenancy in common was denied.

From this decree this appeal was taken.

The error assigned was that the court erred in dismissing the bill.

*S. S. Hollingsworth* and *George W. Biddle* (with whom were *J. L. Reynolds, F. W. Hughes* and *Boughter*), for the appellant, A. Wilhelm.—I. As to want of jurisdiction: (*a*) The main question here is the question of accounting, the extent of the premises held in common is a question entirely subsidiary to this main question. A question which, standing alone, a court of equity might not perhaps have jurisdiction of, when it arises in a proceeding within the jurisdiction of courts of equity, is never treated as an obstacle in the way of the exercise of such jurisdiction: Eaton's Appeal, 16 P. F. Smith 483; McCallum *v.* Germantown Water Co., 4 Id. 40; Richards' Appeal, 7 Id. 105; Horwitz *v.* Norris, 10 Id. 261; Kisor's Appeal, 12 Id. 428; Bacon's Appeal, 7 Id. 504; Ogden's Appeal, 20 Id. 501. (*b*) When a court of equity has assumed jurisdiction of a cause, upon any ground, it will proceed and decide the whole case: 1 Story's Equity Jurisp., §§ 64, 67 and notes.

II. As to non-joinder of necessary parties: It is alleged that the heirs of all parties in interest should be made parties, because a question of title arises incidentally. But the rule laid down in Calvert on Parties, p. 10, is: " All concerned in the demand ought to be made parties in equity. Not all concerned in the subject-

[Wilhelm's Appeal.]

matter, respecting which a thing is demanded ; but all concerned in the very thing which is demanded, in the matter petitioned for, in the prayer of the bill, or, in other words, in the object of the suit :" S. P. 1 Dan. Ch. Prac. 216. The reason there given shows that all necessary parties are joined in the present suit. It is there said that all parties interested in the object of the suit must be joined, or " otherwise the defendant might be harassed by as many suits as there are parties interested in the account." In the present case every party interested in the account is joined. There is no other person to whom the defendants are liable to account, or who can " harass" them by another suit.

A consequential interest in the suit does not make the party having it a necessary party : Story's Equity Pleadings, sect. 140, *et seq.* Thus, in Wood *v.* White, 4 Myl. & Craig 460, it was held that the only parties necessary to a bill for specific performance were the parties to the contract sought to be enforced, though it involved a decision on the title of parties not before the court.

III. As to alternative prayer of bill : The rule as to bills with a double aspect is thus laid down in 1 Dan. Ch. Prac. 384 : " It sometimes happens that the plaintiff, or those who advise him, are not certain of his title to the specific relief he wishes to pray for ; it is, therefore, not unusual so to frame the prayer, that if one species of relief sought is denied another may be granted." The bill in the present case, as amended, sets forth the title of the parties thereto to a certain estate held in common, by reference to the title papers, and then prays for an account of ores taken from certain premises, if these be the premises held in common, but if the tenancy in common is of a greater extent, then of the ores taken from such extended area. A bill with such an alternative prayer is exactly such a bill as, to use the language quoted above, "it is not unusual to frame." And the cases, which are numerous, all sustain the correctness of such a bill. Some of the leading cases on this subject are collected here : McConnell *v.* McConnell, 11 Verm. 290 ; Strange *v.* Watson, 11 Alabama 324 ; Stein *v.* Robertson, 30 Id. 286 ; Luigan *v.* Henderson, 1 Bland's Ch. (Md.) 236 ; Mercer *v.* Stark, 1 Sm. & Marsh. 221 ; Gerrish *v.* Towne, 3 Gray 82 ; Colton *v.* Ross, 2 Paige 397 ; Bennet *v.* Vade, 2 Atkyns 325 ; Rawlings *v.* Lambert, 1 Johns. & Hem. 458. These cases all hold that where the facts on which the plaintiff's case rests are certain, but the legal inference from these facts doubtful, the court will always entertain a bill with a prayer for relief, framed with a view to whatever inference may be drawn from the facts. This is what has been done in the present case. The bill sets forth the deeds and records, and recites the descents. It says the court may come to one conclusion of law, or it may come to another, as to the extent of the tenancy in common, and it prays an account according to the conclusion to which the court may come. See

29 P. F. SMITH—9

Davis *v.* Otty, 2 De Gex, J. & S. 238; Ashhurst's Appeal, 10 P. F. Smith 290; Danzeisen's Appeal, 23 Id. 65.

IV. As to Statute of Limitations: The addition of new matter does not, *per se*, make the bill a new bill from the time of the amendment. The addition must "affect either the parties or strangers," and it must not be included in any matter stated in general terms in the original bill: 1 Dan. Ch. Prac. 402; Story's Eq. Pl., sect. 904. To enable a defendant to avail himself of the statute when there has been an amendment, there must be some new matter introduced affecting him, and not contained in the original bill; a more specific or a slightly varied statement of what was generally or substantially averred in the original bill is not enough to give him this right. In the amended bill there is no new matter affecting the defendants, nor is there anything in it not included in the original bill. The averments of the amended bill are, with two exceptions, substantially the same as those in the original bill, the merely formal difference being that in the amended bill the title papers, instead of being only referred to, are in many instances set out at length. The two exceptions are the additional averments, one setting forth the partition of 1851; the other setting forth the record of the equity-suit for an account, commenced also in 1851. Now the introduction of these averments into the amended bill could not in any way affect the title to the common property, or the extent of it, as fixed and defined by the partition and agreement of 1787. It was of this common property that an account of the ores was sought. The new averments are only averments, in effect, that in 1849, and again in 1851, the defendants who now demur for a misdescription of the common property, held precisely the same view of the proper construction of the title-papers thereto as the complainants in this suit. They are, in effect, evidence of acquiescence in the construction of the title set forth in the original bill. No case has gone so far as to say that an amendment setting forth evidence makes the amended bill thereby a new bill. The cause of action is the same, and so long as this is the case no amendment can be open to the objection of the bar of the statute, unless the original bill is liable to the same objection, and that is not pretended in this case: Knapp *v.* Hartung, 23 P. F. Smith 290; Coxe *v.* Tilghman, 1 Wharton 287; Yost *v.* Eby, 11 Harris 328; Smith *v.* Bellows, 27 P. F. Smith 441. The amended bill differs from the original bill in the form of the prayer for relief. This change beyond doubt cannot make the bill a new bill; when the specific relief prayed for cannot be granted, yet the relief to which the plaintiff is entitled will always be granted under the prayer for general relief, if not inconsistent with it: 1 Dan. Ch. Prac. 377 *et seq.* and notes. And the prayer may be made at bar, when certainly it would be too late to plead the statute: 1 Dan. Ch. Prac. 378, note 5, and cases there cited. In Wilkinson *v.*

Beal, 4 Madd. 408, Sir J. Leach, V. C., said: "That when a plaintiff had prayed for the wrong specific relief, he might obtain the relief his case entitled him to under the prayer for general relief." The same thing was decided in Wilkin v. Wilkin, 1 John. Ch. 111; in English v. Foxall, 2 Peters 595; in Graham v. Berryman, 4 C. E. Green (N. J. Ch. Rep.) 29.

*W. MacVeagh* and *R. C. McMurtrie* (with whom was *T. Cuyler*), for the appellees, Robert and G. Dawson Coleman.—I. As to want of jurisdiction: Where plaintiff has a right to an account because of a title in himself and another, he must allege that title as the ground of his right. He cannot deny it and then ask the court to say, first, that he has it; and, second, because he has it, decree an account. The plaintiff's right to an account is statutory; when he denies a tenancy in common he excludes the jurisdiction the statute gives. That which is a preliminary to the jurisdiction cannot be incidental to the relief: Railroad Co. v. Snowden, 6 Wright 488.

II. As to non-joinder of necessary parties: The plaintiff denies the title, which alone gives him the right to sue, and asks to have it litigated. He must join parties who will be bound by a decree, that is, the parties who are seised of the common property.

III. As to alternative relief: This is not a case where, under certain facts, the plaintiff is entitled to relief in one way or another. Here the plaintiff denies the title under which alone he can have any relief, and then, if the issue is found against him, prays alternatively for a decree as to the very property, the title to which he denies. It is as if in a bill for specific performance the plaintiff should deny that the defendant had agreed to purchase, ask the court to determine he had, and if he had, then enforce the contract: Lindsay v. Lynch, 2 Sch. & Lef. 9; Woollam v. Hearn, 7 Ves. 211.

IV. As to the Statute of Limitations: The original bill averred that the account was sought in respect of ore taken in a particular limited locality. He set out in his bill the boundaries of three hills, and then averred that "the said three hills, viz.: the large Iron Hill, the Middle Hill, and the Grassy Hill, constitute and compose the Cornwall Ore-Banks and Mine-Hills, as in and by the said draft, reference being thereunto had when produced, will more fully and at large appear."

Our points are: (a) The amendment was a material alteration and variation of the cause of action, and for the first time introduced on the record a legitimate cause of action. (b) Though the court would in equity allow an amendment if applied for in proper time, thus saving the expense of withdrawing the bill and of filing a new one; yet if, after objection is taken by the defendant, more than six years are permitted to elapse, they cannot allow such

amendment. (*c*) If an amendment is allowed in any material matter, so that this newly-stated fact is necessary to the plaintiff's right to a decree, the bill dates as if filed from that time, for then for the first time the cause of action is stated, on which the decree is to be founded. (*d*) The amendment in this respect is not so made as to cure the original objection. The amendment was of a material matter, because it introduces another and distinct piece of property as the subject of an account, or it is not an amendment. For the whole scope of this bill is to raise the question whether the ore outside is held by the same title as that which is admitted to be held in common. The property thus introduced was not the same as was mentioned in the original, but covers ore and mineral property outside of the bounds set forth in the bill. After averring a tenancy in common and setting out a survey as descriptive thereof, which corresponds with the description in the original bill, they proceed to deduce a title by reciting deeds and wills which have been decided in this court to give a right outside of these limits similar or identical with that which is within. Are these claims two distinct things? Is a right to account for profits received from white acre a distinct cause of action from the right as to black acre, which constitute one farm held by A. and B. as tenants in common under one deed? Purefoy *v.* Purefoy, 1 Vernon 29. The amended bill is, therefore, for an account of one tenancy in common, not of several distinct properties, and it is for the first time made or demanded in 1872. Unless, therefore, by the fiction of calling this claim a mere amendment of a bill filed in 1865, it is a new bill, and dates from its filing. The rules as to pleading, it is submitted, settle this. The rule is thus stated: Where the cause of action is for the first time stated in an amendment, not by varying the grounds of a former claim, but by introducing a new subject-matter, and this constitutes one claim or cause of action, it dates from the day of filing the amendment. Any other rule would enable a plaintiff to bring in new matter or causes of action and additional items which could not be sued for in a new action by reason of the bar of the statute: Altree *v.* Horden, 3 Jurist 816; 1 Dan. Ch. Prac. 423; Chambers *v.* Waterman, Leg. Gaz., April 29th 1870, 129; Vermillyea *v.* Odell, 4 Paige 121; Shields *v.* Barrow, 17 Howard 143; Holmes *v.* Trout, 1 McLean 1; Bank *v.* Israel, 6 S. & R. 295; Shock *v.* McChesney, 4 Yeates 510; Magaw *v.* Clark, 6 Watts 528; Miller *v.* McIntyre, 6 Peters 61; Christmas *v.* Mitchell, 3 Ired. Ch. 535; Coppen *v.* Gray, 1 You. & Col. Ch. 205; Allison *v.* Hernig, 8 Law J. Ch. N. S. 223; Jennings *v.* Howe, 5 Id. 12; Clegg *v.* Clegg, 2 Russ. & Myl. 570; Spalding *v.* Kelly, 7 Sim. 373; Wood *v.* Anderson, 1 Casey 407; Dudley *v.* Price, 1 B. Monroe 82.

*E. Spencer Miller* and *Thomas E. Franklin* (with whom were

*C. B. Penrose* and *George M. Kline*), for the appellants Grubb.— As to the Statute of Limitations: (*a*) One of the defendants, Robert Coleman, in whose behalf the Statute of Limitations was set up, resided beyond the seas. He resided there when the bill was filed, and when the plea was filed in 1865, and the *presumption* is that he has ever since resided there: 1 Greenl. on Ev., sect. 41; Best on Presump. 186; Starkie's Ev. 1252. (*b*) The pendency of the bill of 1851 for an account prevented the running of the statute. An account may run for years after a bill is filed and still be brought in by the master appointed under the bill: Adams *v.* Dowding, 2 Madd. 53; Jeremy's Equity 511; Bell *v.* Read, 3 Atkyns 590; Bulstrode *v.* Bradley, 3 Id. 582; 1 Seton on Decrees 98; Smith *v.* Brush, 11 Conn. 359; Holabird *v.* Burr, 17 Id. 17. It follows that pending a proceeding for an account, if a new bill be filed for the account accruing subsequently, the pendency of the first may be pleaded in bar: Bell *v.* Read, 3 Atkyns 590. Under the bill of 1851 the account was taken down to January 1859. The liability to account was not finally settled under this bill until 1869. The decree in that case applied in express terms to the entire tenancy in common, irrespective of any lines or boundaries. The account sought for by the present bill accrued during the pendency of the bill of 1851, and might have been taken under it, but was not. Certainly, therefore, the statute did not run against it until the suit was terminated, or at least until the filing of the master's report, in January 1868, and the amended bill was filed in June 1872. (*c*) The extent of the tenancy in common in the ore-banks and mine-hills, as between the parties to this account (to whom the title subsequent to 1787 is deduced) wholly depends upon the true construction of the agreements of 1787, fully set forth in the bill of 1865. This construction was for the court, and any averment of the pleader as to the meaning was simply an expression of his views upon a question of law, and, if mistaken, of no consequence, unless the true construction would defeat his right altogether. A legal inference is not traversable: Richardson *v.* Mayor of Oxford, 2 H. Bl. 182; Stephen on Pleading 191-2.

Mr. Justice SHARSWOOD delivered the opinion of the court, October 12th 1875.

These are appeals from the same decree. The court below sustained the demurrer to the amended bill and ordered it to stand dismissed, on the ground that it presented a new cause of action barred by the Statute of Limitations, leaving the plaintiffs at liberty to proceed on the original bill, and without prejudice to the right of Clement B. Grubb and E. Burd Grubb, administrators of Edward B. Grubb, deceased, to proceed on their petition of 29th November 1873, under the decree on the bill filed June 7th 1851. From this decree the plaintiffs below, and also the Messrs. Grubb, who were defendants, have appealed to this court.

[Wilhelm's Appeal.]

The cause has been very ably and elaborately presented both orally and in the printed arguments. The main point is one of considerable nicety and difficulty, turning, as we shall see, entirely upon the construction to be put upon the pleadings, the original and amended bills. Several incidental questions have been raised and discussed which it will be unnecessary to consider and decide under the view we have taken of the case. The hinge upon which the whole controversy turns is this: Does the amended bill of 1872 set out a new and different cause of action from that contained in the original bill of 1865? It cannot be, indeed it has not been, denied that, if it does, then it appears upon its face that the bar of the Statute of Limitations was complete at the time the amended bill was filed, and it is well settled that when this is the case the statute need not be set up by plea or answer, but advantage may be taken of the defence by demurrer. It will be sufficient to refer to the lucid and able opinion of the learned president of the court below for the rule upon this subject, and the authorities by which it is so amply sustained.

. What constitutes a new cause of action, which is precluded as well in equity as at law from being introduced by way of amendment, and which, if made, as it may be by consent or acquiescence, does not relate to the original filing of the bill or commencement of the action, but in which, in all respects so far as regards such new cause, the action or proceeding as *lis pendens* dates from the amendment? Our Acts of Assembly have very much extended the right and power of amendment in actions at law, so that we may assert without much hazard that the rules upon this subject at law and in equity are the same. Indeed, it is expressly enacted by the Act of Assembly of May 4th 1864, sect. 2, Pamph. L. 775, that "in all proceedings in equity, according to equity forms, the several District Courts and Courts of Common Pleas in this Commonwealth, may permit, at their discretion, and when in their opinion the same will affect the merits of the matter in controversy and expedite justice, amendments to be made in bills, answers, pleas, or other matters, in the same manner as now obtains in common-law cases and practice."

We are thus, by legislative mandate, for rules as to amendments in equity proceedings, referred to those which prevail in "common-law cases and practice," intending, no doubt, to incorporate all the provisions of the Acts of Assembly, and to make one uniform system for both classes of suits. Whether the effect of this was in any respect to enlarge the powers which courts of equity already possessed, and had always exercised whenever the claims of justice as between the parties demanded it, matters not. We can at least consult with confidence our decisions on amendments at law when bearing upon the same questions in equity. The power of amendment at law has been enlarged so as to comprehend not only the

names of the parties, but the introduction of new parties on the record; and not only the grounds of the action, but the form of it, so that it can be changed from the form of *ex contractu* to a form *ex delicto*: Smith *v.* Bellows, 27 P. F. Smith 441. But nevertheless the limit of the power of amendment always has been, and still is, that no new cause of action can be introduced and engrafted upon the original declaration: Ebersoll *v.* Krug, 5 Binn. 53; Cunningham *v.* Day, 2 S. & R. 1; Newlin *v.* Palmer, 11 Id. 98; Wilson *v.* Hamilton, 4 Id. 240; Wilson *v.* Wallace, 8 Id. 53. Citations to this point might be multiplied *ad nauseam*. To what extent this limitation operates as a restraint upon the power of amendment has been long settled by a series of determinations of which it will be sufficient to refer to a few of the leading ones. The principle was stated by Mr. Justice Duncan in Cassell *v.* Cooke, 8 S. & R. 287, in these words: "The true criterion is whether the alteration or proposed amendment is a new and different matter, another cause of controversy, or whether it is the same contract or injury and a mere permission to lay it in a manner which the plaintiff considers will best correspond with the nature of his complaint, and with his proof and the merits of his case." So in Coxe *v.* Tilghman, 1 Wharton 287, Mr. Justice Sergeant said: "It was settled soon after the passing of Act of 21st of March 1806, that the plaintiff is entitled to amend his declaration or add a new count at any time before or during the trial of the cause, provided he do not introduce a new cause of action. But what amendment does introduce a new cause of action has given rise to frequent controversies, and in many instances the amendment has been refused as not coming within the limits prescribed. An examination of the decided cases will show that in actions *ex contractu*, so long as the plaintiff adheres to the original instrument or contract on which the declaration is founded, an alteration of the grounds of recovery on that instrument or contract, or of the modes in which the defendant has violated it, is not an alteration of the cause of action. In an action on a policy of insurance, where the plaintiff declared on losses by capture by an enemy and perils of the sea, the court permitted an amendment by adding a count for a loss by barratry. The object of the action, says Tilghman, C. J., was to recover for a loss covered by the policy, and this amendment did not go out of the policy. Anon., cited in Rodrigue *v.* Curcier, 15 S. & R. 83." It was accordingly decided in Coxe *v.* Tilghman, that in an action of covenant, amendments of the declaration assigning new breaches of covenant on the same instrument, on which the original counts were founded, and alleging performance on the part of the plaintiff in another mode than was alleged in the original counts, are admissible. So in Stewart *v.* Kelly, 4 Harris 160, in an action on a contract for the sale of merchandise, the declaration alleged delivery by the plaintiff, which the evidence failed to establish. An application

was made during the trial for leave to amend the declaration by averring the readiness of the plaintiff to deliver, and the refusal of the defendant to receive and pay for the merchandise, which amendment the court below refused to permit; this court held that the refusal was error, and reversed the judgment. See, also, to the same effect: Yohe *v.* Robertson, 2 Whart. 155; Miller *v.* Frazier, 3 Watts 456; Proper *v.* Luce, 3 Penna. Rep. 65; Robinson *v.* Taylor, 4 Barr 242; Mechanics' and Tradesmen's Ins. Co. *v.* Spang, 5 Id. 113; Smith *v.* Smith, Id. 254; Stover *v.* Metzgar, 1 W. & S. 270; Wilson *v.* Clarke, Id. 554. It is unnecessary to continue this citation of cases. The books are uniform in support of the same doctrine. In McAdam *v.* Orr, 4 W. & S. 550, in an action of account render, it was held that a count charging the defendant as bailiff of the plaintiff's land, may be added by way of amendment on the trial to a count charging the defendant as tenant in common with the plaintiff.

If, therefore, it should appear that in the plaintiff's original bill the title was set out in such a manner as upon the true legal construction of it he had a right to the account, as he now claims, in the amendment, then the amended bill introduced no new cause of action. Whether the limited claim, as made in the original bill, was the result of mistake, or was by design—whether, as the learned judge below characterizes it, it was "sinning against light and knowledge" from sheer gross ignorance, or because the draughtsman meant then to deny distinctly that the defendants had any title as tenants in common in the tracts of land numbers one and two beyond the lines of the alleged survey by Thomas Clark, ought not, as it seems to us, to make any difference. All that had been decided by this court in Blewett *v.* Coleman, 4 Wright 45, was that any of the tenants in common of the ore-hills had the right, under the agreements of August 30th 1787, to take ore within the natural boundaries of those hills, although outside of the Clark survey. It was not decided, and never has been expressly decided, that they had the right to open holes and sink drifts on the surface of those tracts, though such a result may, perhaps, be deduced from the opinion. We may consider that the bill of 1865 was carefully and skilfully drawn, so as not to preclude the plaintiffs from taking and maintaining the position when the account came to be taken, that all the veins and ores outside of that alleged survey were their exclusive property, and that the ore they had themselves mined on what they thus claimed should not be brought into the account. It is true that in Coleman *v.* Grubb, 11 Harris 402, the jury refused to find whether the draft alleged to have been made by Thomas Clark, was the survey referred to in the proceedings in partition; yet the jury in Blewett *v.* Coleman did; and in the opinion of this court in that case it is said: "The Clark survey has embarassed the parties interested in these hills long

enough," and " probably it will be well for the parties when no more is heard about it." Yet, perhaps it would be going too far to say that they are concluded by anything which has been decided upon this subject, and that to set up the Clark survey as the boundary of the tenancy in common was "sinning against light and knowledge." It was thrown out from consideration in Coleman *v.* Grubb, because the jury did not find it ; and in Blewett *v.* Coleman it was not satisfactorily proved. Be this as it may, as we have seen, a man may at law, and much more in equity, shift his ground, provided his title and the facts charged will sustain the new ground he assumes, and the decree for which he prays, or indeed any other consistent decree within his prayer for general relief. A very striking illustration of this is to be found in Danzeisen's Appeal, 23 P. F. Smith 65, and indeed we need go no further than that case for authority to support the doctrine. There the bill set up a trust, either *ex maleficio* or by a parol declaration, and prayed an account of the trust property and a reconveyance. It was not clearly made out by the proofs, and the bill was dismissed at Nisi Prius. When the case came up on appeal before the court in banc it was held that the facts stated in the bill and supported by the proofs made a mortgage; and a decree was entered that the defendant should account as mortgagee. No amendment was moved for, nor was one necessary in that stage of the proceedings, as the court would have been bound to allow such an amendment in the manner of charging and in the prayer for relief as would make them conform to the true equity of the plaintiff. The Court of Appeals might well consider that as actually done which ought to have been done in the court below. I was at Nisi Prius when the case was heard on appeal, but I should have concurred in the decision. The idea of its being a mortgage was not suggested on the argument of the cause below. Nor ought it to make any difference in the case now before us, that when the limited nature of plaintiff's claim was pleaded as a sufficient defence to the bill, though it may be inferred from the record that the plaintiffs set down the plea to be argued upon the question of its sufficiency, yet for some reason not explained they filed a replication, and the cause went to proofs. We may admit that up to the filing of the amendment they adhered to the design to insist upon their separate title outside of the Clark survey ; that they did not mean to admit any right in the defendants as tenants in common in the ore lying underneath tracts numbers one and two, outside of the natural boundaries of the hills or outside of the lines of the Clark survey. But surely the view they took of their legal rights, or of the extent of the tenancy in common at the commencement of the proceedings, is no criterion of the extent of the power of amendment. It was certainly not so thought

in Coxe *v.* Tilghman, where new breaches were allowed to be assigned at the trial, not known nor thought of when the declaration was filed; nor in McAdam *v.* Orr, where on the trial the plaintiff was permitted to shift his ground from a claim in account render against the defendant as tenant in common to a claim against him as bailiff of his own land. The true criterion is, as all the authorities show, did the plaintiff so state his cause of action originally as to show that he had a legal right to recover what he subsequently claims? A declaration on one bond or note cannot be amended by the introduction of a count upon another, but a count on the original consideration may be amended by a count on the note or bond given for it; and *e contra*, a count on the original consideration may be added to a count on the bond or note.

The question then is, would the plaintiff, under the title set out in the original bill, have been limited to the ore mined within the lines of the Clark survey, or could the defendants have insisted upon bringing in also the ore taken by the plaintiffs on the tracts owned by them outside?

The original bill commences by setting out the title of both plaintiffs and defendants as tenants in common to certain ore-banks and mine-hills, and their different shares and purparts of the same. In the course of this statement or deduction of title, the two agreements, both dated August 30th 1787, are recited, by the first of which it was agreed by and between the then owners and tenants in common that the said ore-banks and mine-hills should thereafter remain together and undivided as a tenancy in common, and because it was suggested that the said agreement required further explanation, and that it might so happen that veins of ore might extend beyond the limits of the surveys then lately made by Thomas Clark, it was further expressly declared and agreed by the second or supplemental agreement, bearing date the same day, by and between the same parties, that Burd Grubb, Henry Bates Grubb, and Robert Coleman, and their respective heirs and assigns, should have full liberty and privilege of ingress, egress and regress to and from the said mine-hills, and should have free and uninterrupted liberty and power to dig, sink shafts, drive drifts, raise and carry away any ore that might be found to extend beyond the limits of the said surveys, without doing any material damage to the ironworks or plantation. It then proceeds to state the partition of November 1787, as expressly excepting out of the lands awarded to Curtis Grubb and Robert Coleman, to be held by them, according to their respective titles, the drafts of the ore-banks and hills to be held by Curtis Grubb, Robert Coleman, Burd Grubb and Henry Bates Grubb, as tenants in common, according to their respective shares, and to the covenants and articles in the said agreements of May 6th and August 30th 1787, with reference to the

record of the partition by a *prout*. It then proceeds to set out the courses and distances of the lines bounding the several hills, according to the Clark survey, concluding with this averment (principally relied on by the appellees as limiting the claim of the plaintiffs to the lines of that survey), "that the said three hills, viz.: the Large Iron Hill, the Middle Hill and the Grassy Hill, constitute and compose the Cornwall Ore-Banks and Mine-Hills, as in and by the said draft, reference being thereunto had when produced, will more fully and at large appear." In this respect, however, the two bills, original and amended, are identical. Indeed, the only substantial difference in the whole frame of the two bills seems to be that the amended bill sets out in full what is merely referred to and recited in the original, until we come to that part where the acts and pretences of the defendants are charged, and the prayers for account. Here, indeed, there is introduced into the amended bill an averment not in the original, that the respondents have mined, dug, raised, taken, and carried away from the said ore-banks and mine-hills, and "under a pretended claim of right, which your orators deny, from the before-mentioned tracts, number one and number two, out of which the draft of the aforesaid ore-banks and mine-hills was excepted, large quantities of iron ore," &c. And while the prayer of the original bill was "for an account of all iron-ore, copper-ore, and other minerals taken from the Cornwall Ore-Banks and Mine-Hills aforesaid," with the usual allegation on the part of the orators, to pay defendants whatsoever upon the said account shall be found to be due them by the orators the amended bill, in addition to this, prefers a prayer, as it is called, with a double aspect, that if the court shall be of "opinion that under the titles to the said ore-banks and mine-hills, and to the surrounding real estate, viz.: tracts number one and number two, as hereinbefore set forth and referred to, your orators are entitled to an account for the iron-ore and copper-ore, and other minerals, or any part thereof taken, as hereinbefore stated, from without the bounds of the aforesaid ore-banks and mine-hills, your orators being ready and willing," &c.

Substantially, then, the cause of action was the same in both bills—for an account of the ore taken under this one title as tenants in common. The extent of that title was a question of law upon the proper construction of the agreements of August 30th 1787. These agreements are fully recited in both bills. If the true construction of these agreements be as zealously maintained, that the tenancy in common comprehended all the ore spreading out and running in veins from the base of the hills underneath the adjoining tracts, then the prayer of the original bill "for an account of all iron-ore, copper-ore, and other minerals taken from the Cornwall Ore-Banks and Mine-Hills," by a fair and reasonable interpretation would include them. It was said in the opinion of

this court, in Coleman's Appeal, 12 P. F. Smith 274, "whether it (the agreement of August 30th 1787) gave to the tenants in common incorporeal mining rights under the adjacent soil of the lands assigned and allotted in severalty, or whether it recognised those veins as forming a part of the entire body of ore connected with and belonging to the mine-hills as a corporeal hereditament distinct and separate from the surface and remaining in common, are questions which do not arise upon this record. In either case, however, as far as this argument is concerned, the result is the same. If it was an incorporeal easement, it was annexed to the ownership of the mine-hills as an appertenance thereto, and if it was corporeal it was a part of them." It is plain, then, that upon this construction, if it be the true one, these outlying veins were a part of the "Cornwall Ore-Banks and Mine-Hills aforesaid," the subject of the tenancy in common forming the ground for the account demanded in the original bill. It seems to be faintly admitted, indeed, that, if the amendment had been made before the bar of the statute was complete, it might have been proper. It is said that in equity it is a mere matter of costs whether an old bill shall be amended or a new bill filed and parties brought in upon new process. The same thing may now be said at law when parties and forms of actions may be changed *ad libitum*. Still this exception to the power of amendment must be maintained if we would escape the grossest incongruities, that a new and entirely different cause of action cannot be introduced and engrafted on the old process. Surely by paying costs a party cannot change ejectment to assumpsit, or a bill for specific performance to a bill to restrain a nuisance: Chambers *v.* Waterman, Leg. Gaz., April 29th 1870, p. 129. If such an amendment passes *sub silentio*, or by an erroneous permission of the court, undoubtedly it must be regarded as a *lis pendens* only from the time of the amendment. The principle has been very accurately and succinctly stated by the present chief justice, in Smith *v.* Bellows, 27 P. F. Smith 441: "The test lies in the cause of action and not the Statute of Limitations. If the cause of action is the same declared upon, then the writ *quoad it* was brought in time. If the cause of action was not the same, then the action was not brought for it, and the Statute of Limitations would fairly apply."

It will be unnecessary to elaborate this cause further. It is not seriously disputed that if this amended bill had been filed originally it would not have been demurrable. That it contains a prayer framed with a double aspect forms no objection to it. The cases cited by the appellants show this, and it is admitted in the opinion by the learned judge below. The rule has been accurately stated by Sir W. P. Wood, afterwards Lord Hatherley, in Rawlings *v.* Lambert, 1 Johns. & Hem. 466: "You have no right to allege two inconsistent states of facts and ask relief in the alternative, for

[Wilhelm's Appeal.]

the two cannot be true ; but you have always a right to state the facts of the case, the documents and deeds, and ask the conclusion of the court on those facts and documents, and say, the court may come to one conclusion of law, or it may come to another ; and you may ask the court to come to a conclusion on the facts which you have disclosed, having stated everything that will enable the court to form a proper judgment. You may ask the judgment of the court on two alternatives. That may be done on any bill without objection." Nor is there any doubt that though a question of title may be necessarily involved, it is within the jurisdiction, for, where there is jurisdiction of the subject-matter, that carries with it jurisdiction to decide every incidental question that is necessarily involved. If, upon a bill to account between tenants in common, a question arises as to the extent of the land comprised in the title, surely it must be competent for the court to determine it, in order to make an end of the whole controversy. Nor do we think that the alleged laches of the plaintiffs ought to have any effect upon this question. There was as much laches in the defendants as the plaintiffs. The cause was put at issue August 19th 1867, and an examiner appointed June 22d 1868 : then both parties went to sleep, and no motion is made in the cause until August 21st 1871, when, the examiner having made no report, on motion of E. B. Grubb, administrator, and one of the appellants here, it was ordered " that any party, plaintiff or defendant, have liberty to set down the cause for argument on the 6th day of November next, upon bill, pleas and answers." Nothing was done under this order, and the next step in the cause is June 3d 1872 ; application to file amended bill. We do not think it lies in the mouth of the appellees to allege laches in the appellants.

Decree reversed, demurrer overruled, and ordered that defendants plead or answer to the amended bill within such time as may be fixed by the court below, and that the record be remitted for further proceedings. The costs of this appeal to be paid by the appellees.